# IN THE COURT OF APPEALS OF IOWA

No. 18-0192
Filed April 18, 2018

**IN THE INTEREST OF C.M.,**
**Minor Child,**

**P.M., Father,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Polk County, Louise M. Jacobs,
District Associate Judge.


　　　A father appeals the termination of his parental rights to his child.
**AFFIRMED.**


　　　Mathew D. Zinkula of Booth Law Firm, Osceola, for appellant father.

　　　Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney
General, for appellee State.

　　　Erin E. Mayfield of Youth Law Center, Des Moines, guardian ad litem for
minor child.


　　　Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**DOYLE, Presiding Judge.**

C.M. was born in 2006. A month after his eleventh birthday, the juvenile court terminated his father's parental rights, finding that the State established the ground for termination set forth in Iowa Code section 232.116(1)(f) (2017) and that termination was in the child's best interests.[1] The father now appeals on both points. Upon our de novo review, we affirm.

### I. Standard of Review and Statutory Framework.

Parental rights may be terminated under Iowa Code chapter 232 if the following three conditions are true: (1) a "ground for termination under section 232.116(1) has been established" by clear and convincing evidence, (2) "the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights," and (3) none of the "exceptions in section 232.116(3) apply to preclude termination of parental rights."[2] *In re A.S.*, 906 N.W.2d 467, 472-73 (Iowa 2018). Our review is de novo, which means we give the juvenile court's findings of fact weight, especially the court's credibility assessments, but we are not bound by those findings. *See id.* at 472. "For evidence to be 'clear and convincing,' it is merely necessary that there be no serious or substantial doubt about the correctness of the conclusion drawn from it." *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983); *see also In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

---

[1] The child's mother's parental rights were also terminated at that time, and she does not appeal.

[2] Because the father does not challenge the juvenile court's determination that none of the exceptions in section 232.116(3) apply to preclude termination of his parental rights, we need not discuss that consideration. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

## II. Discussion.

Iowa Code section 232.116(1)(f) requires the State to prove, among other things, that there is clear and convincing evidence the child could not be returned to the parent's care at the time of the termination-of-parental-rights hearing. *See* Iowa Code § 232.116(1)(f)(1)-(4); *see also In re C.F.-H.*, 889 N.W.2d 201, 205 (Iowa 2016) (discussing paragraph (f)). Based upon the following facts, we agree with the juvenile court that the State met its burden.

In September 2016, the child came to the attention of the Iowa Department of Human Services (DHS) after the child's treating psychiatrist wrote a detailed letter recommending the child be placed out of the father's care.[3] At that time, the child lived with the father in the home of a woman whose relationship to the family is unclear. The child referred to the woman as his "aunt" and "homeschool teacher," while the father referred to the woman at times as his "friend," his "roommate," his "taxi driver," or his "care taker."[4] Also living in the home with the father, the child, and the friend were the friend's fiancé, the friend's twenty-year-old daughter, the child's seventeen-year-old half-sister, five cats, one kitten, and two dogs.

The psychiatrist's letter explained that at the end of August 2016, the child was hospitalized for the second time that year after the child again made threats of suicide and self-harm, as well as threatening to harm others and animals. After the second hospitalization, the psychiatrist consulted other professionals that had

---

[3] It appears the child had been in the father's primary care with some visitation with the mother, but the father reported at times—falsely—that her parental rights had already been terminated.

[4] We will refer to this woman hereinafter as the "friend."

been involved in the child's treatment after the first hospitalization—the child's outpatient therapist, the nurse practitioner (ARNP) that had been treating the child and managing his various prescription medications, and school personnel—and all expressed "concerns for [the child] and his emotional and physical wellbeing."

Ultimately, the father had been given numerous directions and recommendations for the child's treatment following the child's January 2016 hospitalization, but by the time of the second hospitalization, the father had stopped following the professionals' recommendations. Just before the 2016 school year ended, the father removed the child from public school, where the child had an individualized education plan (IEP), "due to conflicts with school staff" and against professionals' recommendations. The friend was to home school the child. The father then stopped giving the child his prescription medications—cold-turkey—without any advice from medical professionals. The child missed multiple therapy appointments because "the whole family ha[d] been sick through the entire summer and were not able to make it to any of [the child's] appointments." The child still had not had a psychological exam, which had been recommended to better help understand the child and his needs. Additionally, despite the recommendation that all animals be removed from the home, the father and the friend refused to do so, not even "to accommodate [the child's] needs." The friend stated "it was her house and she was keeping the pets."

When the ARNP was contacted by hospital personnel after the child's second hospitalization, the ARNP informed the provider that she considered the child's "family situation 'toxic'" and reported that the father and the friend "often embellish and scapegoat [the child]." For instance, the ARNP explained the father

and the friend brought the child to see her about a month prior thereto, reporting "extreme behavior in [the child], including attacking [the friend] and causing injury to her hand." The ARNP related that the friend reported at the appointment that the child had bragged to his therapist about hurting the friend. When the ARNP followed up with the child's therapist, the ARNP learned that not only had the child not bragged, neither the father nor the friend were present during the therapy session to give any account of what the child had said. The ARNP's notes also detailed another false report, wherein the father and the friend claimed an increased dosage of medication, which had been prescribed prior to their cessation of the child's medications, had made the child "more aggressive and more violent towards animals," among other things. The ARNP later found out that the increased-dosage prescription had never even been filled.

The father conveyed various reasons why he decided to stop the child's medications. The father told the ARNP the medications were stopped "in early June [2016] because [the family] wanted [the child] to be 'completely sober,'" stating the child "was actually begging for meds one day and 'this is a sign of his addiction.'" The father told the emergency room nurse the child "gets 'addicted' to the [medication] and since he had his own addiction/recovery issues—he is opposed to his [child] getting any addictive medications." The father also stated he was having financial issues making attending appointments and obtaining medication "impossible." Another time, the father told the child's hospital psychiatrist "that he believed [the child's] provider was pushing meds for her own benefit." The father also maintained he wanted the child to have a psychological examination and "they wanted him to be off his medications for the assessment to

be done accurately." The child believed "he got off the medication because, 'I was a drug addict. . . . I was a drug baby."

The father and friend also gave differing accounts about why they did not want the child to attend public school. They stated they felt the school was "not meeting [the child's] needs" and the child's "teacher was teaching him nothing." The father told the ARNP the child had fallen behind at school and was frustrated the school personnel had not pushed the child, even though the child had met his IEP goals. The friend reported the child had failed public school so had to be homeschooled. The friend even called the child's prior school—after the child had been unenrolled—to complain about the child's removal from the father's care, even though the school was not directly involved in that matter. The written report of the complaint noted the following:

> [The child] functions well at school. There is a lot of drama and trauma in his family life. We appreciate that [the friend] gave them a place to live 2 years ago. Our SUCCESS worker gave a lot of support to this family during the 2014-15 school year. When the SUCCESS program was eliminated from [our school] that summer, we were unable to continue the same level of support. There has been DHS involvement and multiple mental health services through [various providers] (inpatient and outpatient). Mental [h]ealth services were pursued by [the father and the friend] because of problems at home, not school. He did work with the School Based Therapist at [the school] until we discovered he was receiving duplicate services from an outside agency. . . . It's important to note that [the friend] (the person making the complaint) does not have legal standing with the student.

The report also noted the child "did make substantial progress as a second grader last year. On the FAST reading assessment, he went from 35 WPM and 76% accuracy in the fall to 106 WPM and 99% accuracy in the spring."

At the termination-of-parental-rights hearing, the father, despite his opinion to the contrary, showed little understanding of how his actions contributed to the deterioration of the child's mental health. The father denied the friend had any involvement in the child's life, despite the overwhelming evidence showing otherwise. Almost every documented doctor visit or school-related conversation concerning the child involved the friend; she was not merely the driver—she *participated* in the affairs. The father's denial of this fact from the start of his testimony evidences a lack of credibility. The father also denied using a spray bottle to squirt water in the child's face as a punishment, but, again, evidence in the record shows otherwise. He also complained that the child's therapist and the DHS failed to communicate with him about what he needed to do to progress in the case, but he later admitted that had been discussed during numerous family team meetings.

Perhaps more importantly, there was no evidence the father had made any changes or gained knowledge or perspective to support his claim he could provide a safe environment for the child and meet the child's mental-health needs. For example, records show the father took the child off his ADHD medication, among others, but then the father was displeased when the child could not sit still or focus. There is no evidence in the record showing the father had come to understand the consequences of, or necessity for, medication. Similarly, the father also claimed the child was addicted to the medication and therefore stopped it, but there is no evidence to show the father now understands why stopping the medication was wrong or what he should have done instead. The father merely vocalized he should not have taken the child "off his medications," which "resulted in him having

mental issues." There is no evidence the father made any adjustments of his expectations concerning the child's academic success. The father had accused the school of "cutting [the child] too much slack and blaming his hyperactivity on mental health problems instead of holding him accountable." This is simply not the case.

The child's clinical neuropsychologist summarized:

> [The child] comes from a horrific background of abuse and neglect that has caused tremendous psychopathology, and he is at great risk for psychological/psychiatric dysfunction, substance abuse, anger problems, and behavioral/conduct disturbance, including increasingly antisocial behavior without concerted, aggressive mental health intervention. He has difficulties with depression, anxiety, and may well have PTSD.
>
> He has a major ADHD and needs . . . medication for same, managed, obviously, by an adult.
>
> . . . .
>
> Structure, structure, structure—individuals with the kinds of neuropathology that [the child] has benefit from increased structure, small things to large, such as where he keeps his supplies, what cues are there to tell him/remind him what to do, etc. He may well not organize well on his own and so much help with concrete organizational strategies will be critical.
>
> . . . .
>
> Lots of refreshers will be helpful. Keep in mind that [the child] is working harder than most to do well in his schooling, so extra work can be extremely stressful, and the balance of the extra work that he needs cognitively with fatigue and stress, along with the balance of having down/fun/socialization time, should be considered carefully.

There is no evidence in the record to show the father can provide the extensive structure and care that the child needs. Upon our de novo review of the record, the State established by clear and convincing evidence the child could not be returned to the father's care at the time of the termination-of-parental-rights hearing. We therefore agree grounds for termination exist under Iowa Code section 232.116(1)(f).

For the same reasons, termination of the father's parental rights is in the child's best interests. We believe the father loves the child in his own way. However, the child has considerable needs that must be met in a structured home. The child made improvements in foster care and is enrolled in school. The child's guardian ad litem advised the court the child "ha[d] made it clear he does not want to return home to either of his parents. He's fearful of what would happen. It is his wish that he would remain in his current foster home and be adopted there." Giving primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the children, and to the physical, mental, and emotional condition and needs of the child, termination of the father's parental rights is in the child's best interests. *See M.W.*, 876 N.W.2d at 224; *see also* Iowa Code § 232.116(2).

### III. Conclusion.

Because we agree with the juvenile court that grounds for termination exist under Iowa Code section 232.116(1)(f) and termination of the father's parental rights is in the child's best interests, we affirm the order terminating the father's parental rights to the child.

**AFFIRMED.**